IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES HARVARD, | ) | CASE NO. 1:13-CV-2464 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff James Harvard's ("Plaintiff" or "Harvard") application for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be AFFIRMED.

### I.  PROCEDURAL HISTORY

Harvard filed an application for Disability Insurance benefits on April 26, 2010. (Tr. 136).  Plaintiff alleged he became disabled on April 8, 2010 due to suffering from colitis, depression, a learning disorder, and a personality disorder. (Tr. 162).  The Social Security Administration denied Plaintiff's application on initial review and upon reconsideration. (Tr. 73-76, 85-91).

At Plaintiff's request, administrative law judge ("ALJ") Ben Barnett convened an administrative hearing on June 29, 2012, to evaluate his application. (Tr. 37-70).  Plaintiff,

represented by counsel, appeared and testified before the ALJ. (*Id.*).  A vocational expert ("VE"), Ms. Price, also appeared and testified. (*Id.*).

On August 9, 2012, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 12-26).  After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 6).  The Appeals Council denied the request for review, making the ALJ's August 9, 2012 determination the final decision of the Commissioner. (Tr. 1-5).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. § 405(g).

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

## II. EVIDENCE

### A.  Personal and Vocational Evidence

Harvard was born on July 3, 1959, and was 53-years-old on the date the ALJ rendered his decision. (Tr. 42, 235).  Accordingly, Plaintiff was considered to be a "person closely approaching advanced age" for Social Security purposes.  *See* 20 C.F.R. § 404.1563(d).  Plaintiff completed high school and two years of college. (Tr. 163).  He testified that he was taking college classes in communications. (Tr. 46).  Harvard has past relevant work as a customer service clerk, a buyer assistant, and a repair service clerk. (Tr. 65).

### B.  Medical Evidence[2]

#### 1.  Mental Impairments

Plaintiff pursued mental health treatment at the Far West Center beginning in 2008. (Tr. 590).  In September 2008, Harvard was diagnosed with major depression (recurrent and moderate) and Asperger's syndrome. (*Id.*).  His Global Assessment of Function ("GAF") score was 59, representing moderate symptoms.[3] (*Id.*).  Plaintiff continued to undergo mental health treatment at the Far West Center until around 2010.

On October 28, 2009, Harvard attended a psychological evaluation with Richard Litwin, Ph.D., upon referral from the Cleveland Metro Bureau of Vocational Rehabilitation. (Tr. 323-26).  Dr. Litwin made note of Harvard's low tolerance for frustration. (Tr. 325).  The doctor opined that Plaintiff needed to work alone or with a certain amount of autonomy, rather than as

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

[3] A GAF score "is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006) (*citing* DSM-IV-TR at 34).  A score of zero represents the most severe level of impairment in psychological functioning, and a score of 100, the most superior. *Id.*  A GAF score in the range of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

part of a group, but with sufficient oversight so as to know what was expected of him. (Tr. 325-26).  Dr. Litwin recommended that Plaintiff work with a therapist to better understand his personality traits and develop more effective coping skills. (Tr. 326).

On October 15, 2010, Plaintiff underwent a consultative psychological evaluation with Herschel Pickholtz, ED.D. (Tr. 345-52).  Harvard felt that he was unable to work, because he could not find a job that paid well. (Tr. 345).   Plaintiff stated that he had been released from his past job, because he did not fit in, and was terminated from 40 prior jobs. (*Id.*).  In terms of daily living, Harvard cared for his hygiene, went to the library to read and look for work, returned home, made dinner, and read or listened to the radio. (Tr. 349).  Plaintiff spoke with three good friends and his sister once a month. (*Id.*).  He independently cleaned his home, did laundry, and grocery shopped. (*Id.*).  Harvard lived alone, and although he did not have a good relationship with his parents, he did with his two sisters. (Tr. 345).  Plaintiff regularly consumed alcohol on weekends and became intoxicated. (Tr. 346).

Harvard explained to Dr. Pickholtz that he experienced thoughts of suicide in the past, and attempted suicide as a teenager, but was never hospitalized for psychiatric reasons. (Tr. 347).  He reported a history of depression, mood swings, angering easily, and being unable to get along with others. (*Id.*).  He was not taking any psychotropic medication. (*Id.*).  Dr. Pickholtz opined that Harvard described symptoms that were moderate in severity, and with future psychiatric treatment, Harvard's affective complaints would improve. (*Id.*).

After performing a mental status examination, Dr. Pickholtz opined that Harvard had little insight as to his history of psychological treatment. (Tr. 347).  Plaintiff's dress and hygiene were average, and the psychologist noted that motivation and cooperation were in the low-average range. (*Id.*).  Harvard's verbalizations were coherent and relevant, and Dr. Pickholtz

4

observed no signs of tangential or circumstantial thinking, pressured speech, rambling, or flight of ideas. (*Id.*).  Dr. Pickholtz described Harvard's affect as somewhat constricted and his mood as a little depressed. (*Id.*).  However, Plaintiff displayed no signs of mood swings or anxiety, impulsivity or compulsions, and he denied thought disturbances and hallucinations. (Tr. 347-48).  Harvard was also well-oriented, his consciousness was clear, and his IQ fell in the high-average range. (*Id.*).

Dr. Pickholtz administered the MMPI-II, a psychometric test. (Tr. 349-50).  The doctor recounted that Plaintiff had an excessive tendency to over-report psychopathology, endorsing items reflective of psychotic processing, severe depression, and anxiety. (Tr. 350).  Dr. Pickholtz concluded that Harvard's clinical profile was inconsistent with his daily activities and non-history of psychotic symptoms. (*Id.*).  In his final summary, the doctor noted Plaintiff had a history of losing jobs, difficulty controlling his temper, and becoming easily agitated. (*Id.*).  Dr. Pickholtz opined that Harvard's struggles may be related to personality issues, a mood disorder, and alcohol abuse. (*Id.*).  The doctor concluded that with sobriety and psychiatric treatment, the impact of Harvard's psychiatric issues on functioning should be no more than moderate. (*Id.*).

In terms of work-related mental abilities, Dr. Pickholtz opined that Plaintiff's ability to understand, remember, and follow instructions was mildly impaired. (Tr. 351).  Harvard's ability to maintain attention and perform simple, repetitive tasks was mildly impaired. (*Id.*).  Plaintiff was moderately impaired in his ability to relate to others, including co-workers and supervisors. (*Id.*).  His ability to withstand stress and pressure associated with day-to-day work activities was markedly impaired. (*Id.*).  Dr. Pickholtz diagnosed alcohol abuse, moderate mood disorder, learning disorder, and personality disorder. (*Id.*).  The doctor assigned a GAF score of 48,

indicating serious symptoms; however, he opined that with sobriety and treatment, Plaintiff's GAF should be no less than 56, signifying moderate symptoms. (Tr. 352).

On November 22, 2010, state agency reviewing physician David Dietz, Ph.D., conducted a review of the record. (Tr. 354-67).  As part of this review, Dr. Dietz considered whether Plaintiff met or medically equaled any listed impairment as set forth in the social security regulations.  In terms of the "B" criteria for Listing 12.04, Dr. Dietz found Harvard to be mildly limited in activities of daily living; moderately limited in maintaining social functioning; moderately limited in concentration, persistence, or pace; and having displayed no episodes of decompensation for an extended duration. (Tr. 364).  The doctor further opined that Plaintiff did not meet the "C" criteria of the listing. (*Id.*).  Dr. Dietz concluded that Harvard could complete a variety of complex tasks in situations where his duties are relatively static, changes can be explained, there are no strict production standards or schedules, and no more than superficial interaction with others is required. (Tr. 370).

During December 2010, Plaintiff presented to Veteran's Administration Hospital. (Tr. 395).  He reported feeling "melancholy," and that he had not taken psychotropic medication in ten years. (*Id.*).  Testing in the form of a PHQ-9 screening revealed mild depression. (Tr. 397).

On January 13, 2011, Harvard underwent an initial evaluation with clinical psychologist Kenneth Weiss. (Tr. 451-53).  Plaintiff stated that he had obtained an associate's degree with high grades, and soon would be attend evening college classes. (Tr. 452).  He rated his depression at a "4" on a scale of "1 to 10." (*Id.*).  Plaintiff reported that he did not want to take psychotropic medication due to fear of unwanted side effects. (Tr. 453).  Harvard continued routine treatment approximately once every two weeks with the psychologist.  In February 2011, Harvard was doing well in school, and he exhibited productive speech, a well-organized thought

process, and a euthymic mood. (Tr. 381).    On March 10, 2011, Dr. Weiss observed improvement, and Harvard acknowledged feeling quite better. (Tr. 378).

During June 2011, Plaintiff started treating with George Serna, Ph.D., for depression. (Tr. 511).    A mental status examination revealed that Plaintiff had a depressed mood and affect; otherwise, he was alert and oriented, appropriately attired and groomed, had fair eye contact, was cooperative, had fair insight and judgment, and exhibited normal speech and thought content. (*Id.*).    Dr. Serna diagnosed depressive disorder and assigned a GAF score of 55. (Tr. 512).    In August 2011, Plaintiff reported depression related to stressors, including medical problems, inability to find a job, and social isolation. (Tr. 502).    Dr. Serna indicated that Plaintiff seemed less anxious and appeared motivated to learn how to compensate for his limitations. (*Id.*).    A mental status examination revealed the same findings as June 2011. (*Id.*).    During December 2011, Plaintiff stated that his depression continued and the only positive in his life was that he continued to do well academically. (Tr. 548).    Dr. Serna recorded generally unremarkable mental status findings and assigned a GAF score of 55. (Tr. 548-49).

On January 9, 2012, Plaintiff reported to Dr. Serna that his depression was unchanged, but he felt better over his break between semesters and had done well academically. (Tr. 546). He was looking at student-work placement. (*Id.*).    Dr. Serna commented that Harvard was optimistic upon learning of possible opportunities through work-study programs. (*Id.*).    The doctor recommended a referral to psychiatry for medication evaluation, but noted that Plaintiff had not been open to the suggestion. (*Id.*).    In March 2012, Plaintiff indicated he was doing well in school, but not making close friends. (Tr. 542).    Dr. Serna described Plaintiff's affect as flat, but mental status findings were otherwise generally unchanged. (*Id.*).

On June 25, 2012, Plaintiff treated with Dr. Serna and requested that the psychologist complete his disability paperwork. (Tr. 668). Dr. Serna noted that Plaintiff, as he typically did, listed multiple medical and social stressors and explained why he was unable to maintain employment. (*Id.*). Nevertheless, Dr. Serna opined that Plaintiff was likely employable under specific circumstances. (*Id.*). The psychologist explained that Harvard's most significant obstacles were his long-standing depression, anxiety, and inability to interact interpersonally with coworkers and supervisors, but noted that Harvard was otherwise a bright individual. (*Id.*). A mental status examination revealed largely unremarkable findings, other than poor eye contact and a depressed mood. (*Id.*). Dr. Serna diagnosed dysthymic disorder and assigned a GAF score of 50. (Tr. 669).

That same day, Dr. Serna completed two different medical source statements addressing Harvard's mental abilities and limitations. The first medical source statement, titled "Medical Source Statement of Ability to Do Work-Related Activities," is part of the record as Exhibit 32F. (Tr. 651-53). Dr. Serna opined that Plaintiff had no limitations in his ability to understand, remember, and carry out simple or complex instructions, and was moderately limited in his ability to make judgments on complex work-related decisions. (Tr. 651). Dr. Serna explained that Harvard was "intelligent and tenacious," but could have some difficulty when required to make complex independent decisions without direction from others. (*Id.*). The psychologist opined that Plaintiff was moderately limited in his ability to interact appropriately with the public, supervisors, and coworkers. (Tr. 652). Harvard was also moderately limited in his ability to respond appropriately to usual work situations and changes in routine work setting. (*Id.*). Dr. Serna wrote that Harvard was inflexible in thinking, and his constant flat emotional affect, as well as his negativity or pessimism, made it difficult for him to relate personally to others. (*Id.*).

8

The doctor noted that Plaintiff's dysthymic disorder would likely impact his motivation to put himself in a social environment. (*Id.*).

Dr. Serna's second report was titled, "Medical Source Statement About What the Claimant Can Still Do Despite Mental Impairment(s)," and is part of the record as Exhibit 33F. (Tr. 655-61).  Dr. Serna indicated that Plaintiff suffered from the following symptoms: emotional lability, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt/worthlessness, social withdrawal or isolation, a flat affect, and anxiety related to interpersonal situations. (Tr. 655-56).  These findings were based on Harvard's self-report and evaluations from past providers. (Tr. 656).

As to functional limitations, Dr. Serna opined that Plaintiff would miss work twice per month as a result of his impairments. (Tr. 657).  Plaintiff would suffer mild loss in his ability to understand, remember, and carry out simple or detailed instructions. (*Id.*).  Harvard would be no more than mildly limited in his ability to maintain attention and concentration for extended periods. (Tr. 658). Plaintiff was moderately limited in his ability to maintain attendance, deal with stress of semi-skilled and skilled work, perform at a consistent pace, interact with the public, maintain socially appropriate behavior, respond to change, use public transportation, and set realistic goals. (Tr. 658-59). Dr. Serna identified marked limitations in Plaintiff's ability to work in coordination with or proximity to others, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers and peers. (Tr. 658-59).  Dr. Serna concluded that Plaintiff would exhibit the following: (1) no limitations in activities of daily living; (2) marked limitations in maintaining social functioning; (3) seldom deficiencies of concentration, persistence, or pace; and (4) no episodes of deterioration or

decompensation in work or work-like settings, causing withdrawal from the situation or an exacerbation of signs and symptoms. (Tr. 660).

### 2. Physical Impairments

In March 2009, Harvard was diagnosed with moderately severe colitis, and testing also suggested chronic active proctitis. (Tr. 314-16).  During December 2010, Plaintiff reported to healthcare providers at the Veteran's Administration Hospital that he experienced intermittent diarrhea for many years. (Tr. 395).  He had taken Mesalamine suppositories for nine months, but could not otherwise afford medication. (Tr. 396).

On January 5, 2011, treatment notes reflect that Harvard reported two to three bowel movements per day, and mild diffuse abdominal pain. (Tr. 392).  When stressed, he had bowel movements every hour. (*Id.*).  Plaintiff did not experience weight loss and had cut back on dairy and wheat products, which helped his symptoms. (*Id.*).  Physicians continued to monitor and adjust Harvard's diet. (Tr. 383-86).  During August and July of 2011, Harvard complained of abdominal pain, which he described at level "1" out of "10" in severity. (Tr. 510, 539).

On May 7, 2012, Plaintiff stated that he felt well and was taking Mesalamine and rectal supplements. (Tr. 631).  He had two to three bowel movements per day, some mixed with blood. (*Id.*).  Plaintiff denied weight loss, abdominal pain, nausea, and vomiting. (*Id.*).  The treating healthcare provider opined that Plaintiff had "very mild ulcerative proctitis and no functional impairment from this condition." (Tr. 632).

On May 30, 2012, Plaintiff's primary care physician Zenaida Jands, M.D., completed a "Medical Source Statement" describing Plaintiff's abilities. (Tr. 638-46).  Dr. Jands noted that she treated Harvard once every four to six months in 20 to 30 minute sessions. (Tr. 638).  The doctor opined that Plaintiff's diagnoses were ulcerative proctitus, and depressive or dysthymic

disorder, noting that Plaintiff was actively undergoing mental health counseling. (*Id.*).  Dr. Jands identified symptoms including abdominal pain, frequent bowel movements, diarrhea, and chronic fatigue. (*Id.*).  She opined that Plaintiff's pain was severe enough to "often" interfere with his attention and concentration. (Tr. 639).  Dr. Jands also opined that Plaintiff was markedly limited in his ability to deal with work stress due to diarrhea and frequent bowl movements. (*Id.*). The doctor identified a number of physical limitations and concluded that Harvard would miss work more than three times per month due to his impairments. (Tr. 645).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.  The claimant has not engaged in substantial gainful activity since April 8, 2010, the alleged onset date.

3.  The claimant has the following severe impairments: colitis; personality disorder; alcohol abuse; dysthymic disorder (diagnosed previously as mood disorder, NOS); and depressive disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except work limited to simple, routine, repetitive tasks; occasional changes in the work setting; and occasional and superficial interaction with [the] public [and] coworkers.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on July 3, 1959 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

. . .

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, from April 8, 2010, through the date of this decision.

(Tr. 14-26) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x. 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in

dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

### A. The ALJ's Step Three Finding

#### 1. Whether the ALJ erred in his analysis of Listing 12.04

Harvard argues the ALJ erred at step three of the sequential analysis by finding that he did not meet or medically equal the listing for affective disorders, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 ("Listing 12.04"). Plaintiff contends that if the ALJ had properly evaluated his mental impairments, the ALJ would have concluded that his conditions satisfied Listing 12.04. The undersigned disagrees and find that the ALJ did not commit error with respect to his evaluation.

The third step of the disability evaluation process asks the ALJ to compare the claimant's impairments with an enumerated list of medical conditions found in the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii)*; *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). A claimant will be deemed disabled if his impairments meet or equal one of these listings. In order to "meet" a listing, the claimant must

satisfy all of the listing's requirements. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). However, if the claimant does not meet all of the listing's requirements, he may still be deemed disabled if his impairments "medically equal" the listing in question. 20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3). To do so, the claimant must show that his impairments are "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(b)(3). At this step, it is the claimant's burden to provide evidence showing that she equals or meets the listing. *Retka v. Comm'r of Soc. Sec.*, No. 94-2013, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) (*citing Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).

Importantly, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* Similarly, for a plaintiff to show that he "equals" a listing, he must "present medical findings equal in severity to *all* the criteria for the one more similar listed impairment." *Id.* at 531. It is not sufficient for a plaintiff to demonstrate that the overall functional impact of his impairments is as severe as that of a listed impairment. *Id.*

Listing 12.04 covers affective disorders, "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Sbpt. P, App. 1. In order to meet Listing 12.04, a plaintiff must satisfy the criteria set forth in Paragraphs A and B, or Paragraph C.

In challenging the ALJ's finding, Plaintiff contends that he met the criteria of Paragraph A, and that the ALJ erred in failing to discuss the Paragraph A criteria when making the listing determination. However, if any error exists in the ALJ's failure to expressly evaluate Paragraph

14

A, it is harmless.  Following a detailed discussion, the ALJ reasonably found that Plaintiff did not meet the requisite B criteria, and Listing 12.04 requires both A and B paragraphs to be met or equaled for a finding of disability. (Tr. 15-17).

Next, Plaintiff asserts that the ALJ's evaluation of the B criteria was not supported by the record.  Paragraph B of Listing 12.04 requires a plaintiff to show that he suffers from at least *two* of the following:

1.  Marked restrictions of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or pace; or
4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Sbpt. P, App. 1, § 12.04(B).  To establish a "marked" limitation in any of these areas, the plaintiff's impairment must "seriously interfere with the ability to function independently, appropriately, and effectively." 20 C.F.R. § 404, Sbpt. P, App. 1; *Foster v. Bowen*, 853 F.2d 483, 491 (6th Cir. 1988).

Here, the ALJ carefully explained why Harvard was not markedly impaired in any major mental functioning domain as required by the B criteria. (*Id.*).  Upon review, the ALJ's finding as to each of the four major functioning areas is reasonable and supported by substantial evidence in the record.  Moreover, in regard to the B criteria, Plaintiff asserts that the medical evidence shows he suffered from a marked limitation in only one area: social functioning.  Plaintiff offers no evidence in support of a finding that his mental impairments would meet a second prong under Paragraph B, such as a marked restriction in daily living, even though the listing requires such a showing in order to establish disability.

As to social functioning, the one functional area under Paragraph B that Plaintiff does address, Plaintiff contends that the ALJ's decision is flawed because the ALJ considered no medical evidence when concluding the B criteria was not met.  Plaintiff then points to medical

evidence, which he argues establishes a marked limitation.  Harvard asserts that Dr. Serna identified a marked limitation in maintaining social functioning. (Tr. 660).   Next, Harvard alleges that Dr. Dietz identified a marked limitation in the ability to interact appropriately with the general public, suggesting a marked impairment in social functioning. (Tr. 369).

Plaintiff's argument lacks merit.   When making the residual functional capacity determination, the ALJ explained why he afforded little weight to Dr. Serna's finding of a marked limitation in social functioning, as will be further discussed herein. (Tr. 24).  The ALJ's decision to do so is substantially supported.  Contrary to Plaintiff's assertion, Dr. Dietz's opinion supports the ALJ's listing determination.  Dr. Dietz opined that in relation to the B criteria of Listing 12.04, Plaintiff had *moderate* difficulties in maintaining social functioning. (Tr. 364).

Furthermore, the ALJ's finding of a moderate limitation in social functioning is supported by substantial evidence.  As the ALJ assessed, Plaintiff's testimony shows that he was social with a small group, including his immediate family. (Tr. 16).  Harvard indicated that he visited his mother and occasionally watched his niece and nephew. (Tr. 16, 47, 57-57).  He spent time drinking with friends. (Tr. 16, 63).  Moreover, he regularly visited the library to use a computer. (Tr. 16, 45-46, 213).  Harvard's sister also indicated that Plaintiff was social with family and friends each week, and was social through his attendance at college. (Tr. 16, 228, 252).  She further reported that Harvard regularly went to the library, grocery store, and friends' homes. (Tr. 16, 224, 227-28).  Accordingly, Plaintiff's allegation of error lacks merit.

In addition, Harvard disputes the ALJ's analysis of the C criteria of the listing.  Paragraph C demands a medically documented history of chronic affective disorder lasting at least two years in duration and causing more than a minimal limitation in the plaintiff's ability to do basic work activities. 20 C.F.R. Pt. 404, Sbpt. P, App. 1, § 12.04(C).  In relevant part, the listing also

16

requires symptoms or signs "currently attenuated by medical or psychosocial support" of "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." *Id.*

In the present case, the ALJ assessed that Plaintiff did not meet the paragraph C criteria because the evidence did not demonstrate a propensity toward decompensation. (Tr. 17).  Upon review, the ALJ's finding is substantially supported.  Medical records do not indicate a propensity toward decompensation.  Additionally, Dr. Serna specifically opined that Plaintiff would not exhibit episodes of deterioration or decompensation in a work-like setting. (Tr. 660). The state agency reviewing physicians also found that Plaintiff did not meet or equal the Paragraph C requirements.

Harvard argues that the ALJ's analysis of the C criteria was inadequate, and that findings made by his physicians suggest he has a propensity toward decompensation.  Plaintiff cites to Dr. Pickholtz's opinion that he was markedly limited in his ability to withstand the pressures associated with day-to-day work activities. (Tr. 351).  Harvard also points to Dr. Litwin's notation of a low tolerance for frustration. (Tr. 325).  Finally, Harvard asserts that Drs. Jands and Serna opined he would be absent from work approximately two to three times per month due to his symptoms. (Tr. 645).  Taken together, Harvard maintains that such findings show he medically equaled the requirements of Paragraph C.

Plaintiff's argument fails to undermine the ALJ's decision.  In his opinion, the ALJ discussed Dr. Pickholtz's finding that Plaintiff markedly limited in his ability to handle the stress of day-to-day work. (Tr. 23).  However, the ALJ found that this opinion was inconsistent with various pieces of evidence, including Dr. Serna's assignment of moderate limitations in dealing

with stress; Harvard's conservative mental health treatment; and Harvard's reports of primarily mild symptoms. (*Id.*).  The ALJ also discounted Drs. Jands and Serna's opinion as to absences because of the conservative nature of Plaintiff's treatment, generally normal mental status findings, and Plaintiff's reports of only low abdominal pain and improved bowel functioning. (Tr. 24).  Although Dr. Litwin opined to a low tolerance for frustration, the doctor did not indicate that Plaintiff was likely to decompensate. (Tr. 407-10).  Accordingly, Plaintiff's allegation of error is not well taken.

### 2.  Whether medical expert testimony was necessary

Plaintiff also requests a remand to obtain medical expert testimony regarding the listing. Harvard asserts that the ALJ failed to adequately develop the administrative record, and given the complexity of the medical evidence in this case, medical expert testimony regarding equivalency was warranted.

The regulations give the ALJ the discretion to ask for and consider opinions from experts on the issue of medical equivalency. 20 C.F.R. § 404.1527(e)(2)(iii).  Social Security Ruling 96-6p also advises:

> [L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight.

SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  The signature of a state agency medical consultant on a Disability Determination and Transmittal Form ensures that consideration by a physician designated by the Commissioner has been given to the issue of medical equivalency at the initial and reconsideration levels of administrative review. *Id.*  "[T]he Psychiatric Review Technique Form and various other documents on which medical and psychological consultants

may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review. *Id.*

Additional medical expert evidence is required under two circumstances, both of which are discretionary: (1) "When no additional medical evidence is received, but in the opinion of the administrative law judge . . . the case record suggest[s] that a judgment of equivalence may be reasonable;" or (2) "When additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity." *Id.* at *4.

The Sixth Circuit addressed this issue in *Curry v. Secretary of Health & Human Services*. No. 87-1779, 1988 WL 89340, at *4-5 (6th Cir. 1988) (unpublished). Curry argued that the ALJ should have retained a medical expert to testify as to whether his impairments combined to medically equal a listed impairment. *Id.* at *4. The Sixth Circuit rejected this argument. *Id.* at *5. The court held, *inter alia*, that because two state agency experts had considered whether the claimant's impairments equaled any listing, it was not necessary for the ALJ to secure the opinion of another medical expert to testify on the issue. *Id.* Accordingly, it upheld the Commissioner's decision that Curry's impairments did not meet or equal any listing. *Id.*

Here, Dr. Dietz completed a Psychiatric Review Technique form dated November 22, 2010. (Tr. 354). The doctor evaluated whether Harvard met or medically equaled the requirements of Listing 12.04. (*Id.*). He opined that Plaintiff was mildly limited in activities of daily living; moderately limited in maintaining social functioning; moderately limited in maintaining concentration, persistence, and pace; and suffered from no episodes of decompensation. (Tr. 364). The physician also found that Plaintiff did not meet the C criteria of the listing. (Tr. 364-65). On May 25, 2011, Dr. Meyer conducted a review of the updated record

and confirmed Dr. Dietz's assessment. (Tr. 406). Harvard does not argue that the ALJ abused his discretion, that new evidence warranted the need for further consideration, or that the ALJ believed a finding of equivalency reasonably likely. Accordingly, Plaintiff's argument for further evidence from a medical expert on the issue of equivalency is not well-taken.

**B. Whether the ALJ properly assessed the opinions of Plaintiff's treating physicians**

Plaintiff also contends that the ALJ erred in failing to comply with the treating source doctrine. According to Harvard, the ALJ did not provide "good reasons" for attributing less than controlling weight to medical source statements authored by Drs. Serna and Jands. The parties do not contest that these doctors qualify as "treating physicians," and the Court will assume, without deciding, such for the purpose of this analysis.

An ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule" is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2). The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544.

When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by applying factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6). The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating

source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5).

### 1. Dr. Serna

Dr. Serna began treating Plaintiff for mental health issues around June 2011.  On June 25, 2012, the psychologist completed two separate medical source statements setting forth Plaintiff's mental limitations.  These medical source statements have been designated in the record as Exhibits 32F and 33F.

The ALJ attributed "great weight" to the report in Exhibit 32F. (Tr. 24, 651-53).  In this report, Dr. Serna opined that Plaintiff suffered from *mild* limitations in his ability to understand, remember, and carry out instructions; *moderate* limitations in interacting with supervisors, the public, and coworkers; and *moderate* limitations in responding to changes in work setting. (Tr. 24).  The ALJ explained that Dr. Serna's identification of mild to moderate limitations was consistent with treatment records, which revealed mild depression, relatively normal mental status evaluations, and only conservative treatment. (*Id.*).  The ALJ's observation that the limitations assigned by Dr. Serna in this report were consistent with treatment records is substantially supported and serves as "good reason" for the ALJ's attribution of weight.

Plaintiff asserts that the ALJ ought to have adopted the findings set out in Dr. Serna's medical source statement contained in Exhibit 33F, because they were a more accurate representation of his limitations. (Tr. 655-81).  In the Exhibit 33F report, Dr. Serna assigned mild and various moderate limitations in a range of work-related areas of functioning, along with some marked limitations in relation to social functioning, such as in interacting with supervisors,

coworkers, and peers. (*Id.*).  Harvard maintains that the ALJ's reasons for rejecting this medical source statement were unclear and insufficient.

The undersigned finds that the ALJ provided adequate rationale for his decision to attribute "less weight" to Dr. Serna's report located in Exhibit 33F. (Tr. 24).  The ALJ explained that although Dr. Serna authored the two medical source statements at issue here on the same day, the statements contained conflicting findings.  For example, in the Exhibit 33F report, Dr. Serna opined that Harvard had *marked* limitations in various areas related to social functioning, whereas the psychiatrist identified only *moderate* limitations in social functioning in the Exhibit 32F statement. (Tr. 652, 658-60).  Such inconsistency reasonably drew into question the accuracy of the psychologist's findings.

Plaintiff asserts that the inconsistency between the two medical source statements could have led the ALJ to have adopted the limitations set forth in Exhibit 33F, rather than those of Exhibit 32F.  However, the ALJ's decision provides good reason as to why the ALJ attributed greater weight to the Exhibit 32F report.  As the ALJ explained, the limitations in Exhibit 32F were supported by treatment notes, which reflected "mild depression, relatively normal mental status evaluation results, and treatment limited to conservative and routine measures." (Tr. 24).  On the other hand, the more serious limitations in Exhibit 33F were inconsistent with the same treatment notes. (*Id.*).

Thereafter, the ALJ cited to various pieces of evidence to show that the limitations in Exhibit 33F were inconsistent with the record. (*Id.*).  For example, a June 2010 mental status examination indicates that although Plaintiff had a depressed mood and affect, he was cooperative, alert, oriented, and appropriately attired; exhibited normal speech and thought content; and had fair insight and judgment. (Tr. 24, 511-12).  A depression screening from

December 2010 showed only mild depression. (Tr. 24, 397).  Treatment notes from March 10, 2011, indicate that Harvard was "euthymic and his affect was appropriate," his speech was productive and thoughts well-organized, and he acknowledged improvement in his mental health due to therapy sessions. (Tr. 24, 378).  Throughout this period of treatment, Plaintiff did not take psychotropic medication, and treatment was limited to counseling and therapy sessions.  Such relatively normal findings and conservative treatment did not comport with the more serious limitations that Dr. Serna assigned in Exhibit 33F.

Plaintiff argues that other evidence in the record supports the limitations set forth in Exhibit 33F.  He points to an employment assessment from 2010, the findings of Dr. Litwin generally, and a GAF score of 50, representing serious symptoms.  While the employment assessment communicates difficulties in performing a customer service representative position, including problems interacting with coworkers and supervisors, the ALJ reasonably found the assessment not a fully accurate indicator of Plaintiff's abilities. (Tr. 23, 432-36).  As the ALJ explained, the assessment involved one specific job, in only one employment setting. (*Id.*).  Additionally, in his opinion the ALJ recounted many portions of the record supporting less than marked impairments in social functioning.  For instance, Plaintiff had relationships with family members, spent time with friends, regularly went to the library, and attended college classes. (Tr. 16).  Such evidence further supports the ALJ's decision to discount the more serious limitations in the Exhibit 33F report.  In regard to Dr. Litwin, the doctor opined that Harvard could work in certain work settings where interaction with others was limited, despite difficulties with social interaction. (Tr. 325).  Finally, Plaintiff's GAF score often represented than he suffered from less than serious symptoms, and indeed, supported Dr. Serna's limitations as set out in Exhibit 32F.  For instance, in June 2011, Plaintiff's GAF score was 55, indicating only moderate symptoms.

(Tr. 22, 511-12). As a result, such evidence does not undermine the ALJ's treating source determination.

Additionally, Plaintiff argues that the ALJ ought to have adopted Dr. Serna's opinion that Plaintiff would be absent from work approximately two times per month, because such a finding was consistent with the opinions of other medical sources. Plaintiff notes that like Dr. Serna, Dr. Jands opined that Plaintiff would be absent from work, and Dr. Pickholtz indicated that Plaintiff had marked limitations in his ability to withstand the stress and pressure of day-to-day work.

This argument is also not well-taken. As will be further discussed herein, the ALJ gave good reasons for his decision not to fully adopt Dr. Jands' findings, including the doctor's finding regarding absences. While Dr. Pickholtz opined that Harvard's ability to withstand stress and pressure associated with work was markedly impaired, the ALJ found that such impairment was inconsistent with Dr. Serna's opinion that Plaintiff was no more than moderately limited in various work-related functions as set out in Exhibit 32F. (Tr. 23). Furthermore, Dr. Pickholtz opined that with sobriety and treatment, Plaintiff's GAF score should reflect no more than moderate symptoms. (Tr. 352).

### 2. Dr. Jands

Dr. Jands served as Plaintiff's primary care physician. In May 2012, she completed a medical source statement in which she explained that she treated Harvard once every four to six months for approximately 20 to 30 minutes. (Tr. 638). She indicated his diagnoses were ulcerative proctitis and depressive or dysthymic disorder. (*Id.*).

Plaintiff argues that the ALJ's reasons for giving "little weight" to the doctor's medical source statement were not "good reasons." However, the ALJ provided a number of reasonable

24

grounds for attributing less than controlling weight to Dr. Jands' opinion, and in doing so, sufficiently complied with the mandates of the treating source doctrine.

To begin, the ALJ questioned the basis for Dr. Jands' finding that Harvard was markedly limited in his ability to deal with work stress. (Tr. 24, 639).  As the ALJ noted, the medical source form indicates that Dr. Jands based this limitation on Plaintiff's statement that diarrhea and frequent bowel movements caused him stress. (*Id.*).  The ALJ found Plaintiff was not fully credible when describing severity of his symptoms, which Plaintiff does not contest.  Accordingly, the ALJ appropriately devalued this portion of Dr. Jands' opinion.

The ALJ also granted less weight the portion of Dr. Jands' opinion which was outside of the physician's specialty.  The regulations indicate that in general, the opinion of a specialist about medical issues related to her specialty is given more weight than the opinion of a source who is not a specialist. 20 C.F.R. § 404.1527.  Here, the ALJ observed that Dr. Jands did not specialize in mental health, and as a result, gave less weight to the doctor's opinion addressing Harvard's depression.  In addition, on the medical source statement, Dr. Jands herself noted that Plaintiff was actively treating with another healthcare provider for his mental health issues, suggesting that mental healthcare was not the focus of her relationship with Harvard. (Tr. 638).

Lastly, the ALJ explained that the significant physical limitations Dr. Jands recommended, as well as Dr. Jands' finding that Harvard would be absent from work more than three days per month, were inconsistent with other evidence in the record. (Tr. 24).  The ALJ found such limitations to be at odds with Harvard's conservative treatment, as well as Harvard's reports of only low-level abdominal pain and improved bowel function. (*Id.*).  Plaintiff points to no evidence showing more than conservative treatment for colitis or ulcerative proctitis, and the record does not appear to reflect such.  Additionally, the ALJ cites to a number of records that

support his reasoning. (*Id.*).  For example, in January 2011, Plaintiff reported mild diffuse abdominal pain, no weight loss, and bowel movements two to three times per day, but that altering his diet assisted with diarrhea. (Tr. 392).  During July and August 2011, Harvard experienced abdominal pain, but described its severity at a level "1." (Tr. 510, 539).  On May 7, 2012, Harvard stated he was feeling well overall. (Tr. 631).  Although he reported blood in his stools, Plaintiff denied weight loss, abdominal pain, nausea, or vomiting. (*Id.*). The examining healthcare provider opined that Plaintiff had a "very mild disease" and recommended medication. (Tr. 632).  The ALJ's recitation of Plaintiff's course of treatment accurately reflects Plaintiff's history of conservative treatment, including Plaintiff's subjective reports of mild pain. (Tr. 19-20).  Accordingly, this reason, coupled with the others described above, serve as good reasons for discounting Dr. Jands' opinion in compliance with the treating source doctrine.

Plaintiff asserts that the ALJ improperly rejected Dr. Jands' opinion due to the durational nature of her treatment relationship with him.  The ALJ described the treatment relationship as "brief" and highlighted that Dr. Jands treated Harvard every four to six months in short sessions.

The regulations explain that an ALJ may discount a medical source based on the length of a treatment relationship and frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i). Generally, the longer a treating source has provided treatment, and the more times a treating source has seen the plaintiff, the more weight the ALJ will give to the source's opinion. *Id.*

Here, Harvard does not indicate for how many years, or how many times in total, he treated with Dr. Jands, and the Court is unaware of where such information is contained in the record.  Nor does Plaintiff point to evidence in support of a finding that treatment approximately twice per year in 20 to 30 minute sessions created such a longitudinal picture of Plaintiff's impairment that Dr. Jands' opinion should have been afforded greater weight.   It is unclear

whether the nature of the treatment relationship between Harvard and Dr. Jands was an appropriate ground to discount Dr. Jands' opinion.  Nevertheless, the ALJ did not base his valuation of the doctor's opinion solely on this fact.  The ALJ made short reference to the nature of the treatment relationship and went on to articulate various other good reasons in support of the weight attributed to the physician.  Accordingly, any error that may exist this regard does not necessitate remand.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner be AFFIRMED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  October 10, 2014.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).